Ford *v.* State.

(*Knoxville,* September Term, 1945.)

Opinion filed December 1, 1945.

Designated for publication April 24, 1947.

446

RAULSTON SCHOOLFIELD, of Chattanooga, for plaintiff in error.

NAT TIPTON, ASSISTANT ATTORNEY GENERAL, for the State.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

Plaintiff in error was convicted of murder, in the second degree, of his wife, with a maximum prison sentence of twenty years. He appeals and challenges the sufficiency of the evidence of guilt, the proof of venue, the *corpus delicti* and the admission of certain testimony. The parties had been married seven or eight years and had two living children. The record is replete with evidence of Ford's continued and constant brutal treatment of his wife and repeated threats of death or bodily harm, made to her and to others about her, this conduct and threats coming down to a few days before the homicide, it being shown that on one time a peace warrant was issued to restrain the defendant and at another time he was arrested and convicted of assault on his wife. And, also, bearing upon and in part accounting for this animus of Ford toward his wife, and throwing vivid light upon his motive for getting rid of her, it is shown that he was openly and brazenly unfaithful to her, in constant day and night intimate association with another woman. Proof of a particular threat is made to his wife that he would kill her if she "turned him up" to the Draft Board, and it is shown that she nevertheless did report to the Board that he was not supporting her or the children, that she was forced herself to work and earn this support and that she and the children were not his dependents. While

the custodian of the Board records received a letter purporting to be signed by Mrs. Ford, she could not identify the signature as that of Mrs. Ford, but this proof was supplied by another witness who knew her handwriting.

In March, 1944, Mrs. Ford was working as a waitress at the Krystal, a chain restaurant, at 10th and Market, in Chattanooga. She left the Krystal, in company with a co-worker, Miss Thelma Aslinger, at 12:15 midnight, Friday, March 10, 1944. .They stood together on the street corner awaiting a bus, which she took at 1 o'clock, telling Miss Aslinger that she was to meet her husband. This was the last seen of Mrs. Ford alive. Some thirty-five days later, Sunday morning, April 16th, her body was found floating in the Tennessee River, near the left bank opposite Scottsboro, Alabama, 78 miles below Chattanooga. Although badly decomposed and stripped of nearly all clothing, the body was positively identified by friends called from Chattanooga. It was removed to the Hancock Funeral Home in Chattanooga, where upon examination by the coroner and *post mortem* by a doctor, two parts of a bullet fired from a 32 caliber cartridge, were found within the skull and brain. Both testified to the opinion that the deceased died from this gun shot wound.

Within a few days after the disappearance of Mrs. Ford on the early morning of March 11th, search for her was instituted and reports made to the police and their aid invoked,—but not by her husband, primarily and naturally her companion and responsible for her. The officers at once, on March 14th, sought him and located him at a restaurant on 11th Street. He disclaimed any knowledge of his wife's disappearance or whereabouts. He was asked to accompany the officers to headquarters. This significant incident occurred. As he was leaving

this place he stepped back in the door and handed some articles to a young man named Leigh, who testified that the articles were a lady's gold locket and diamond ring and a small pistol cartridge shell; that he returned the articles to Ford when he came back later. Miss Aslinger, who had last seen Mrs. Ford, and had worked with her that day, described the colored waist and dress she was wearing and identified the waist found on her body, also testified that she was wearing a watch and a gold locket when she parted with her. The watch and locket were later turned over to the police by Miss Lillah Greeson, when Ford was arrested in her house, after the body was found in the river. She was the woman before referred to to whom Ford was devoting his daily attentions. She said Ford had given this jewelry to her. It was proven that the locket Ford had and left with Leigh three days after his wife's disappearance was the identical locket she was wearing the night she disappeared. (The defendant did not take the stand and no explanation was offered of how he came into possession of the locket and watch.) When arrested Ford had in his pocket the same used cartridge shell which he left with Leigh to keep for him. His only explanation of why he had it was that he was just keeping it. There was proof that Ford had been carrying a 32 caliber pistol which it appears belonged to his father, who resided at Whiteside, some 16 miles from Chattanooga, and that he returned this pistol to his father on the Sunday following his wife's disappearance on Saturday morning about 1 o'clock. Attempts were made to secure possession of this pistol, but the father declined for some unexplained reason to produce it. Here was an opportunity to obtain convincing evidence, either that the bullet found in the skull of the deceased was fired from this pistol which was in the possession of the defendant

when his wife disappeared, or that it was not. The defendant failed to make the weapon available for this purpose, and the State seems to have been unable to do so. It is a matter of common knowledge that an F. B. I. test would have solved this vitally important question.

██ ██ Just here, it should be noted, in passing, that since it was obviously within the power of the defendant to produce such evidence, his failure to do so gives rise to a presumption, under well-known rules, that if introduced it would have been unfavorable to him. If he obtained the locket through another and not from his wife, that intermediary should have been available to so testify. And if it was impossible to produce the pistol, this could have been shown by his father, who was not called by him to testify. It is, of course, now well settled that our statute (Code Section 9783) providing that no presumption of the guilt of the defendant shall arise from his failure to testify in his own behalf, has application only to the personal testimony of the defendant himself and does not extend to apparently available testimony by others. *Hays* v. *State,* 159 Tenn. 388, 19 S. W. (2d) 313; *Williams* v. *State,* 164 Tenn. 562, at page 570, 51 S. W. (2d) 482; *Rowe* v. *State,* 164 Tenn. 571, at page 579, 51 S. W. (2d) 505; *Hutchins* v. *State,* 172 Tenn. 108, 110 S .W. (2d) 319.

In both the *Hays case* and the *Hutchins case* the adverse effect is recognized of the failure of a defendant to introduce in his behalf material testimony other than his own.

Immediately upon the recovery and identification of his wife's body, officers arrested Ford, finding him at the home of Lillah Greeson, about 10 p. m. He was brought to the city jail, questioned briefly and held for investigation. This was Sunday night, Apirl 16th. Tuesday morning he was brought before the Police Judge and his case

passed for a week, it appearing that the funeral of Mrs. Ford was to be held that day. He was questioned at different times and by several different officers while at the city jail. Wednesday evening about 12 o'clock he requested that his father be sent for, that he desired, in the presence of his father, to make a statement regarding the death of his wife. It was suggested to him to write his father to this effect. Saying that he was too nervous to write himself, he requested an officer to write out a note to his father and he would sign it, that his father would know his signature. This was done and he signed it. This is not questioned. That note to his father was introduced on the trial and reads as follows:

"Mr. Smith, my daddy gets off work 4 P.M. every afternoon—if you will get him word that I want to see him and talk to him, I will make a complete confession about my wife being murdered. Signed C. D. Ford, Jr."

█ (It appears that on the following day, Thursday, Ford, in the presence of several officers, made a clearly incriminating confession, but upon a full hearing before the trial judge apart from the jury, all testimony relating to this confession was properly excluded by the trial Judge, it appearing that one of the officers had stated to Ford on this occasion that if he made a confession, upon his conviction the prosecution would not ask for the "electric chair," thus bringing into play the well-settled rule precluding the admission of confession obtained by a promise of reward.)

It is urged here that all evidence against the defendant is circumstantial only and that the rules applicable to criminal prosecution resting on circumstantial evidence alone preclude a conviction.

██ But it must be borne in mind that the rules governing an appeal in error differ materially from those

applicable below. In the first place, while presumed to be innocent on his trial below, here the accused is presumed to be guilty. In the second place, even in circumstantial evidence cases, the burden is on the plaintiff in error to show that the evidence preponderates against his guilt and in favor of his innocence. These rules of procedure are too well settled to require citation of authorities.

A fairly full statement of the material facts of the case presented by this record has been made. These incriminating circumstances may be thus summarized:

1. We have a dark background of continued abuse and assaults by the defendant upon his wife indicative of malice and harmful purpose to do her serious bodily harm.

2. Open and notorious relations with another woman, with whom this husband had apparently become infatuated, well known to induce a desire for riddance of an encumbering marital relationship. The books are full of cases of murder under such conditions. Motive is thus established.

3. On the other hand, no suggestion is offered that deceased had any other enemy, or any other relationship, affording a ground of suspicion of motive for the crime against her.

4. When last seen before her death she was on her way to meet the defendant, according to the uncontradicted testimony of her companion. Although the statement of the deceased to this effect made to Miss Aslinger was objected to as hearsay, this testimony was admissable as part of the *res gestae* under *Kirby* v. *State,* 15 Tenn. 259, and our other cases.

Quotation by a witness of what another said is not objectionable as hearsay when a relevant issue in the litigation is whether or not the quoted person made the

statement. Here it was the fact that the deceased made this statement indicative of her purpose, thus reflecting her mental condition and planned course which was testified to by the witness. It was then for the jury to appraise the weight and signficance of this declaration of deceased's intention, as bearing on the determinative issue of whether she met with her husband. It was a similar declaration made by the deceased of his place objective that was held in the *Kirby case, supra,* to be admissible. And see Wigmore, Volume 5, 3d Ed., Par. 1361.

5. She was wearing jewelry which was in the possession of the defendant when he was first interviewed by the officers, three days after her disappearance, which, not otherwise explained, establishes convincingly that he was with the deceased after she parted with her companion at the Krystal Shop, and before her body went into the Tennessee River, where it was found. This is an incriminating circumstances which permits of no conlusion to the contrary of the guilt of the defendant.

6. He was at this time in possession of a pistol of the identical caliber from which the bullet found in her skull was fired. The failure of the defendant to produce this weapon, shown to have been by him delivered to his father on the day following her disappearance, or to account therefor by the clearly available testimony of his father, and thus afford an opportunity for a well-recognized form of test of it, is a damaging circumstance raising a presumption against innocence.

7. And, finally, the note to his father, signed by him, its preparation at his request and its contents virtually dictated by him, in the presence of several unimpeached witnesses, convincingly shows that he knew the circumstances of her murder and inferably was present and a

party to it, despite his many previous denials of all knowledge of her disappearance.

■ It is not possible for this Court to find from these cumulative incriminating circumstances that the evidence preponderates against the guilt of the accused. Assignments challenging the evidence are overruled.

■ ■ Passing to the question of venue earnestly argued by counsel, it is well established in this jurisdiction that (1) venue may be shown by circumstantial evidence and (2) by a preponderance of the evidence only; and that here again on appeal the burden is on the plaintiff in error to show by a preponderance of the proof that the venue was elsewhere than in the County of Hamilton, Tennessee.

■ It is significant that when the Sheriff of the county where the body was found floating in the river discovered it there he at once telephoned to Chattanooga, the city of large size located next above that point on the river. It is thus apparent that no woman had recently disappeared from that community; it was the body of a stranger; it had come from elsewhere. Moreover, the testimony is that its condition indicated a long and rough passage and that it had been in the stream for many days. One witness estimates from its appearance that it had been in the water something more than thirty days. (This was thirty-five days after Mrs. Ford's disappearance.) Also, there was testimony that a body would normally move down stream about two miles a day, drifting slowly. The distance below Chattanooga was approximately 78 miles by water. It was shown that two dams are in the river between Chattanooga and Scottsboro, but the proof is that when the river is high, as it is shown to have been at that time, these dams maintain openings through which a body would naturally pass. And the shredded and torn

conditions of the clothing indicated that the body had had a rough and turbulent passage. Plainly all these circumstances are against the conclusion that the body had been thrown in the river at or near the point where discovered.

Again, Hamilton County, Tennessee, had been the residence of the deceased for years. Her home and children, to whom she was apparently devoted, were there. There is no evidence whatever that she had departed from or had purpose or reason to depart therefrom at the time of her disappearance. She was employed, apparently satisfied with her work, had given no indication of a purpose to quit it, or that she would not be back the next day to pursue it. She left articles of clothing at her place of work. It was the middle of her work week and she had accrued pay which she did not attempt to draw. Every shown circumstance is against the theory that she left the county alive. Moreover, we have found that her husband was responsible for her death, that he was in Hamilton County immediately before and after the event; that this was his place of residence and there is no suggestion that he left this county at or about this time. It is a wild and unwarranted surmise that he conveyed her to some point below Hamilton County on the river and that her body was there thrown into the river. Counsel cite and quote expressions from an unreported case in this Court, but (1) being unreported greatly weakens its weight as authority, as does (2) that it was not the unanimous opinion of the Court, being strongly dissented from, (3) the expressions quoted were used with particular reference to the peculiar facts of that case, and (4) the facts of that case are so dissimilar to those now before us that it is without controlling weight. Conceding the soundness of the statement in that opinion of the general rule that a presumption arises that

the homicide occurred in the county where the body is found, any such presumption fails in the instant case in the face of the evidence to the contrary. This assignment is overruled.

 The *corpus delicti* is questioned but too feebly to call for extended discussion. When a dead body is found floating in a stream with gun shot wounds in the head which experts testify were the cause of death, an inescapable deduction arises of felonious homicide. The concurring circumstances rebut both the alternative theories of accident and voluntary self-destruction. It is not reasonably conceivable that, after having received a fatal wound, either accidentally or by design, Mrs. Ford could or would have cast her body into the Tennessee River.

Finally, counsel press objections to the admission of the testimony above mentioned regarding two notes shown to have been signed by Ford addressed to his father. In this Court counsel assert that the note requesting his father's presence was written "after promises had been made to the appellant, particularly by the Chief of Police," and that this testimony should have been excluded, as was that of the later confession itself. Counsel has fallen into serious error of fact. The proof is clear and uncontradicted that this note incident was the evening before the confession induced by this promise of the Chief of Police, the following afternoon. Moreover, neither in his objections to this made during the trial, nor in his motion for a new trial, did counsel rest his objections on this ground, obviously without foundation in fact. It is this distinction which the trial Court recognized in excluding the one and admitting the other. The other objections are two-fold:

In the first place, complaint is made of the questioning of the accused following his arrest during the several days

and nights while he was in the city jail and under the observation and control of the City Police, before being removed to the county jail, on the charge of murder. Counsel cite and quote from passages in the opinion of the Supreme Court of the United States in the case of *Ashcraft* v. *State of Tennessee,* 322 U. S. 143, 154, 64 S. Ct. 921, 88 L. Ed. 1192, but the facts of the two cases are so dissimilar that the decision relied on is without application. The exhausting continuity of the interrogations in the *Ashcraft case* and the physically disconcerting circumstances, on which that holding was rested, are not to be found here. While Ford was in the city jail for a total of some 96 hours, his examinations by different officers were intermittent and occasional, at no time so extended as to be conceivably exhausting. No threats by word or manner and no mental or physical force appears to have been brought into play upon his body or his mind. He expressed himself to the effect that he had been well treated by the officers, even expressing a preference to remain there under their control, rather than be taken to the county jail.

In our own case of *Rounds* v. *State,* 171 Tenn. 511, 106 S. W. (2d) 212, and in other cases, this Court has not hesitated to strike down as inadmissible confessions obtained after continuous and protracted examinations, without adequate rest, food or sleep, under circumstances tending to destroy the prisoner's physical and mental power of resistance, even though the weight of the proof did not show the use of physical violence. But the rules emphatically announced in this leading case have no application to the facts of the instant case.

Incidentally, it appears that one or more of the several attorneys who called at the jail were not allowed to see the prisoner promptly, but we think this was due in

large part to some confusion as to which of these lawyers had been retained or were desired by the accused to represent him, this being brought about partly by the fact that his father had undertaken to employ one attorney, while the accused had selected another. We have made a careful examination of the record, particularly as it bears upon this question, and we think it clearly appears that the request that his father be sent for with a view to the making of what he termed a "confession about my wife being murdered" came voluntarily from Ford without prompting or any character of inducement. It was suggested to him that he himself pen the note, and it was written down by the officer at his request, stating as we have before related, that he was too nervous to write, but he read it over and freely signed it. As before stated, he did not take the stand, and this testimony of the several officers present is wholly uncontradicted. The other note was merely a request directed to his father to bring in the pistol which he had turned over to his father on the Sunday following the disappearance of his wife early Saturday morning. It was given to the undertaker, Mr. Hancock, on the evening following the arrest of the defendant, at the request of the undertaker who had the body in charge and who had discovered the bullet in the brain. It was not a confession and had no material incriminating significance.

 The other phase of this objection is rested upon an invoked application of the holding of the Supreme Court of the United Statec in *McNabb* v. *United States*, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819, wherein is was held that failure to arraign the prisoner prior to questioning rendered a confession so obtained inadmissable. But the opinion in that case expressly confined application of the holding to Federal Court procedure and was rested

primarily on Federal statutes which differ materially in this regard from our State statutes. And in *Wynn* v. *State*, 181 Tenn. 325, 181 S. W. (2d) 332, this Court recognized this distinction and declined to apply the rule expressly holding that failure to arraign before questioning did not render statements obtained under such circumstances inadmissible. See, also, *Lyons* v. *State of Oklahoma*, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481.

Being clearly of opinion that the plaintiff in error had a fair trial before an impartial jury, and that the cumulative circumstances appearing support the conviction by a preponderance of the evidence, the judgment is affirmed.