CHURN *v.* STATE.

*(Jackson,* April Term, 1947.)

Opinion filed May 3, 1947.

Rehearing denied May 31, 1947.

GEORGE W. SMITH, W. W. BOND and ROSA HAYWOOD, all of Brownsville, for plaintiff in error.

ALLISON B. HUMPHREYS, JR., Assistant Attorney General, for the State.

MR. CHIEF JUSTICE CHAMBLISS delivered the opinion of the Court.

Albert Churn is a laborer working for R. T. Walker and wife on their farm in Haywood County near Brownsville. Convicted of possessing a still for the manufacture of intoxicating liquor, with his punishment fixed at a fine of $100 and ninety days in the workhouse, he appeals and insists that the evidence preponderates in his favor.

Sheriff S. F. Hunter, accompanied by two brothers, Jack and Millard, deputies sheriff, drove to what is described as the "Harrison Place," some three miles from Brownsville, in search of a still reported to be there located. They took different positions for observation of the approach to this reputed location. The three testify to having seen a man coming from the direction of the still along an old road and all three undertake to identify this man as the defendant, although differing in the certainty of their identifications, as well as in other material respects, to which reference will be made.

Sheriff Hunter says that it was a "dark, cloudy day, drizzling rain and the visibility was bad" and that he was

at such a distance that he could not positively identify the man he saw and could not swear he was the defendant. That immediately after having seen this man, he and his brothers followed the old roadbed and found a still, but did not at that time destroy it. He testifies that he and his brothers, later that day, arrested the defendant at the Walker home, carried him in their car to the site of the still, where they then went for the purpose of destroying it, and proceeded from that point with him to the jail.

Jack Hunter testifies that he followed this man he saw, chasing him a mile and a half across the field, and that he recognized him as the defendant; that he then accompanied the sheriff and his brother Millard to the site of the still, which they then and there destroyed, contradicting Sheriff Hunter as to this matter, the relevancy of which will appear.

Millard Hunter testifies that he recognized the man as the defendant, although on cross-examination he admitted that when he saw the man he was "at least seven city blocks" away, but says that he could identify him at this distance because "it was a clear day and not raining, nor was it cloudy." It will be noted that this is a direct contradiction of the testimony of Sheriff Hunter on this vitally material matter of visibility. Millard also testifies on his direct examination that after the man had passed the party went and found and destroyed the still, this again being in direct conflict with the testimony of Sheriff Hunter. However, later, on cross-examination, by way of explanation of having taken the defendant to the location of the still after his arrest, he said that they made this trip back there for the purpose of destroying the still; that they did not take the prisoner back with them for the purpose of inducing him to admit that he was the man who ran away from the still, and that

it was his still, but that they went back in order to tear up the still which they had not previously destroyed. He thus changed his testimony, quite apparently to meet the charge that they had mistreated the prisoner.

The officers made two trips to the Walker place in an effort to arrest the defendant. When they first went there they saw Mrs. Walker, who told them that the defendant had been working around the place all day, doing various chores, and that he was at that time somewhere on the premises. They failed to find him and drove into Brownsville and returned later when they did find and arrest him and carried him first, as before stated, to the point where the still had been found, and from there to jail. They all say that they spent some time at this still location, where they made the defendant get out of the car, but deny, as before stated, that he was taken there for the purpose of forcing an admission or confession.

The three witnesses agree that when they arrested the defendant later the same afternoon, after they had seen him near the still, he was wearing different clothes from those worn by the man they had seen. It was some mile and a half or two miles from the site of this still to the Walker home.

The defendant, testifying in his own behalf, admitted he had been previously convicted of violating the liquor law, but insisted that he had no connection with this still and that he was not in that vicinity on that afternoon, but was engaged all of the afternoon in doing various chores about the Walker place, among other things, bringing up the cows from the back part of the farm, milking, etc. He details his movements with much particularily.

Mrs. Walker corroborates the defendant, going into some detail as to how he was occupied during the day, the effect of her testimony being that the defendant could not possibly have made the trip on foot from the Walker place to this still and back, a distance of some three miles, without his absence having been noted.

Mr. Walker's testimony, while not so directly in point, was corroborative in that he testified that the defendant was working for him on that day and that when he returned after an absence of a portion of the day the work he had instructed the defendant to do had been performed, indicating that he had remained on the premises.

It will have been observed that in two material matters these officers have directly contradicted one another. The matter of visibility was, of course, of extreme importance in view of the conceded distance which these officers were from the man they undertook to identify. In this situation we have the sheriff positively and explicitly testifying that the visibility was poor, that it was drizzling rain and cloudy; and in direct conflict, quite apparently, it seems to us, to bolster his testimony of identification, Deputy Millard Hunter testifies it was a clear day and not raining and not cloudy.

The other contradiction relates to the time when this still was destroyed. Two of the officers testify one way and one another. This became material as bearing upon the purpose of these officers in taking their prisoner to the still site and their treatment of him, to which we will now refer.

The defendant testifies that the sheriff came into the Walker house for the purpose of arresting him, with his pistol in his hand, and struck him in the head with the butt of the weapon; that he was then put in the automobile with the officers and carried to the site of the still and

made to get out and the officers endeavored to force him to admit that it was his still and that he was the man they had seen earlier leaving the place. He persisted in denying this and the officers so concede. Moreover, he says that en route one of the officers struck him in the head and that after they reached the site of the still one of them again struck him; that his head was so badly injured by these repeated blows that it was necessary for him to have the attention of Dr.. Chambers, the county physician, who treated him while in the jail, and of Dr. Scott, who treated him later.

With respect to this grave charge, the testimony of these officers is again in direct conflict. When interrogated touching this matter, two denied that the defendant was struck by either of them after his arrest; but one of them, Deputy Jack Hunter, frankly admits, upon cross-examination, that he struck the defendant while the party was returning in the car to the still and struck him again after they had reached the still. Although he denies that he administered this brutal punishment because the defendant denied ownership of the still, he offers no other explanation for his conduct. And Sheriff Hunter testified that he "went into the Walker house with his pistol in his hand" and arrested the defendant. This was an unjustifiable display of a deadly weapon in making an arrest for a misdemeanor, but it is consistent with the statement of the defendant that he was at that time struck on the head by the officer with the butt of his pistol.

This Court has repeatedly denounced the mistreatment by officers of a prisoner for the purpose of forcing a confession, or for any other reason. And it has been the uniform practice of this Court to refuse to consider a confession obtained from one accused of crime by mistreatment, whether physical or mental. See

*Rounds* v. *State*, 171 Tenn. 511, 106 S. W. (2d) 212, and our cases there cited. Also, *Ford v. State*, 184 Tenn. 443, 201 S. W. (2d) 539.

Quite uniformly the charge that such treatment has been administered has been denied by the officers accused and the Court has been forced to look to other evidential sources to ascertain the facts. Here for the first time, so far as our cases show, we have a clear and unequivocal admission by an officer in charge of a prisoner of inexcusable and brutal physical abuse.

No confession is involved, as none was secured. We would, of course, in conformity with our invariable rule, refuse to admit in evidence a confession made by this defendant, if one had been procured under such circumstances and offered.

We now go further than we have found occasion to go in any reported case heretofore and lay down the rule that, when it appears beyond reasonable doubt that an officer, unless in self-defense, or so required to prevent the escape of one charged with a felony, has physically assaulted a prisoner while in his care, thus violating his official obligation, the criminal law and the constitutional rights of the prisoner, his testimony, and that of his associate officers present without protest at the time, will be received with great caution. The testimony of officers of the law who so far disregard their obligations, while admissible, will not be given favorable consideration in the determination of the case. A partial analogy is offered in the well-established rule that the courts will not admit the testimony of officers, who have violated the constitutional prohibition against searches and seizures, holding it to be better that the guilty should escape than that officers of the law should be permitted to give

testimony procured by violation of the law they are sworn to enforce.

This case might well be reversed upon the strength of the alibi and the directly contradictory testimony of these officers as to the material matters hereinbefore mentioned, but we choose to put the reversal squarely upon the ground of the rejection *in toto* of the testimony of these officers because of their abuse of the prisoner, which could have been for no other purpose than to force an admission from him of guilt,—or in the otherwise unlawful exercise of brutal and cowardly impulses.

Reversed and dismissed.

All Justices concur.