FILED
05/29/2026
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
May 28, 2025 Session Heard at Cookeville[1]

## STATE OF TENNESSEE v. ANTONIO DEMETRIUS ADKISSON A/K/A ANTONIO DEMETRIUS TURNER JR.

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Gibson County**
**No. 19840     Clayburn Peeples, Judge**

_____

**No. W2022-01009-SC-R11-CD**

_____

SARAH K. CAMPBELL, J., concurring in part and dissenting in part.

The majority concludes that Antonio Demetrius Adkisson's confession to law enforcement officers was involuntary and vacates his two convictions for second-degree murder. Whether Adkisson's confession was voluntary under the Tennessee and United States Constitutions is a close question. But applying the same totality-of-the-circumstances test as the majority, I conclude that the confession here was the product of Adkisson's own free will, not police coercion. I therefore respectfully dissent from the majority's analysis of that issue and from the Court's judgment vacating Adkisson's convictions.[2]

I.

The majority opinion's description of Adkisson's detention and interrogation, while thorough, omits a few key details that provide important context for his confession. As the majority correctly notes, when Detective Whitney entered the interrogation room just before 7 a.m.—after Adkisson had been alone for about two hours, save for one minor interruption—it was because Adkisson had knocked on the door and asked to speak with

---

[1] Oral Argument was heard in this case on the campus of Tennessee Technological University as part of the Tennessee American Legion Boys State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

[2] I agree with Court's conclusions that Adkisson was properly transferred from juvenile court to the trial court and that Adkisson voluntarily waived his *Miranda* rights, and I concur in those portions of the majority opinion.

him. After a brief exchange in which Adkisson continued to deny that he had shot anyone, Detective Whitney left the room.

When Detective Whitney returned about ninety minutes later, he told Adkisson that officers were going to execute a search warrant on his house and talk to his stepfather. Detective Whitney then asked Adkisson, "Did you shoot out of fear? Or did you shoot to kill somebody?" Adkisson responded, "I shot out of fear. . . . And I'm sorry for leaving that out, too. I've been waiting on you to come back." That was the first time Adkisson admitted to participating in the shooting. After asking Adkisson some additional questions about the gun, Detective Whitney urged Adkisson to "clear the slate" and to "be a hundred and ten percent real with [him]" and gave Adkisson several opportunities to tell him everything.

Less than a minute after Detective Whitney left the room following that exchange, Adkisson knocked on the door and asked if Detective Whitney could "come back here right quick." He then disclosed new information about the number of people with the victims at the time of the shooting. Detective Whitney again asked Adkisson if he was sure that he was telling him everything. Adkisson responded that he was "trying to think." Detective Whitney told him to "knock on [the] door" if he thought of anything else.

About two minutes later, Adkisson knocked on the door again and told Whitney that he was "gonna start all the way over." Whitney said, "Are you sure? Okay. . . . From the beginning? All right. I don't want no B.S., nothing." Adkisson responded, "I gotcha. . . . I'm sorry for earlier and all." He then gave Detective Whitney a detailed account of what had happened that evening. He explained that his co-defendant had given him a gun after they encountered Young. His co-defendant shot first, and then Adkisson shot when someone with Young pointed a gun at him. This last exchange between Detective Whitney and Adkisson lasted about ten minutes, and Detective Whitney then left the room.

II.

Both the United States and Tennessee Constitutions prohibit the government from introducing a defendant's involuntary confession as evidence in a criminal trial. At the federal level, this protection is rooted in the Self-Incrimination Clause of the Fifth Amendment to the United States Constitution and the Due Process Clause of the Fourteenth Amendment. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000). At the state level, this protection springs from Article I, Section 9, of the Tennessee Constitution, which provides that the accused in a criminal prosecution "shall not be compelled to give evidence

against himself." Tenn. Const. art. I, § 9; *see also State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).[3]

The key question in evaluating voluntariness under the federal and state constitutions is whether the defendant's "will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 433–35); *see also State v. Clark*, 452 S.W.3d 268, 283 (Tenn. 2014) ("To determine whether a confession was given voluntarily, a court must decide whether it was the product of a rational intellect and a free will." (internal quotation marks omitted)); *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). Answering that question requires us to examine the totality of the circumstances surrounding the confession, including "the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). Relevant considerations include the defendant's age, education and intelligence level, and previous experience with the police; the length of the defendant's detention and the nature of the officers' questioning; the conditions of the defendant's questioning, including whether the defendant was injured, under the influence of drugs or alcohol, or in poor health, whether the defendant was deprived of food, sleep, or medical care, and whether the defendant was physically abused or threatened with abuse; whether the defendant was advised of his constitutional rights; and whether the government unreasonably delayed bringing the defendant before a magistrate. *Id.* As the majority correctly observes, we must exercise "special caution" when evaluating the confession of a juvenile. *In re Gault*, 387 U.S. 1, 45 (1967); *see also Haley v. Ohio*, 332 U.S. 596, 303–04 (1948) (explaining when the confession of a "mere child" is at issue, "special care in scrutinizing the record must be used"). Whether the defendant is an adult or a juvenile, the State must prove the voluntariness of a confession by a preponderance of the evidence. *Climer*, 400 S.W.3d at 564.

---

[3] We have said that "the test for voluntariness for confessions under Article I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994); *see also State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992). But the case cited for that proposition—*State v. Smith*, 834 S.W.2d 915 (Tenn. 1992)—made no such sweeping pronouncement. The *Smith* Court relied on the "spirit and principles" of Article I, Section 9, to part ways with one aspect of the United States Supreme Court's reasoning in *Oregon v. Elstad*, 470 U.S. 298 (1992): the effect of an initial confession obtained without *Miranda* warnings on the voluntariness of subsequent statements. *See Smith*, 834 S.W.2d at 918–19. But *Smith* did not hold that the general test for voluntariness under Article I, Section 9, is different from that under the Fifth Amendment. Nor did *Smith* engage in any serious analysis of textual or historical differences between Article I, Section 9, and the Fifth Amendment that would justify adopting a different test under the Tennessee Constitution. *See id.* at 919 (basing departure on the "spirit and principles" of Article 1, Section 9, rather than textual or historical differences); *see also Smith v. BlueCross BlueShield of Tenn.*, 710 S.W.3d 686, 702 n.23 (Tenn. 2025) (explaining that this Court may interpret the Tennessee Constitution differently from the United States Constitution when textual differences exist).

III.

An examination of the totality of the circumstances here persuades me that Adkisson's confession was voluntary.

Start with the "characteristics of the accused." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434). Although Adkisson was a juvenile at the time of his confession, he was seventeen years old and only eight months shy of adulthood. He was a senior in high school and had no intellectual disabilities. He was articulate and engaged during the interview and had no trouble understanding or conversing with the officers. There was no evidence that he was under the influence of drugs or alcohol or suffering from any other condition that would hinder his ability to understand the officers or exercise his own free will. And although Adkisson had no previous interactions with the criminal justice system, he was twice advised of his constitutional rights before the officers began questioning him, including once in the presence of his mother. So Adkisson's characteristics support the voluntariness of his confession.

On balance, the circumstances of the interrogation also cut in favor of voluntariness. Adkisson was not restrained or physically abused. He was seated in a chair at a table. He was offered food and water and afforded bathroom breaks. An officer even brought food from McDonald's into the interrogation room, but Adkisson chose not to eat it. Several hours into the interview, Adkisson told officers that he was cold and asked for a blanket or towel. And although officers told him they did not have one, no evidence suggests that the interrogation room was unreasonably or dangerously cold.

Adkisson remained in the interrogation room for about seven hours total, from around 2:30 a.m. until 9:30 a.m.[4] But the officers did not question Adkisson for that entire time. To the contrary, Adkisson was actively questioned for only around two hours. The longest interview occurred right after Adkisson arrived at the station at around 2:30 a.m. and lasted roughly one hour. He was questioned again for about fifteen minutes at around 3:45 a.m. and for another fifteen minutes at 4:30 a.m. Other than very brief exchanges at around 5 a.m., 6 a.m., and 7 a.m., officers did not talk to Adkisson again until around 8:30 a.m. After a few minutes of additional questioning at 8:30 a.m., Adkisson was again left alone. Each time an officer entered the room after that, it was because Adkisson had

---

[4] At first blush, starting the interrogation after midnight may seem unreasonable. But recall that the shooting occurred late in the evening, at around 9:00 p.m. The officers then spent the next several hours gathering evidence and talking with individuals on the scene who implicated Adkisson and his co-defendant.

requested to talk. When not being interviewed, Adkisson was left alone in the room for lengthy stretches and allowed to rest or sleep.[5]

Officers' intermittent questioning of Adkisson over the course of a few hours is a far cry from the kind of prolonged interrogation that courts have deemed coercive. *Compare Stein v. New York*, 346 U.S. 156, 185–86 (1953) (confession voluntary where defendants experienced twelve hours of intermittent questioning over thirty two hours), *overruled on other grounds by Jackson v. Denno*, 378 U.S. 368 (1964); *Ford v. State*, 201 S.W.2d 539, 544 (Tenn. 1945) (questioning voluntary where "examinations by different officers" over ninety-six hour period were "intermitent [*sic*] and occasional, at no time so extended as to be conceivably exhausting"); *and Jackson v. McKee*, 525 F.3d 430, 434–35 (6th Cir. 2008) (confession voluntary where seventeen-year-old defendant was "never interrogated for more than two and a half hours at a time" during a period spanning forty hours); *with Davis v. North Carolina*, 384 U.S. 737, 746–47 (1966) (confession involuntary where defendant was held in jail cell for sixteen days and interrogated at least daily); *Spano v. New York*, 360 U.S. 315, 322 (1959) (confession involuntary where the defendant "was questioned for virtually eight straight hours before he confessed, with his only respite being a transfer to an arena presumably considered more appropriate by the police for the task at hand"); *Haley*, 332 U.S. at 598 (confession involuntary where fifteen-year-old defendant was questioned for about five hours shortly after midnight "in relays" of one or two officers); *and Rounds v. State*, 106 S.W.2d 212, 213 (Tenn. 1937) (confession involuntary where six officers, "taking turn [*sic*] about, questioned [the defendant] from Monday night until early Friday morning" while depriving him of sleep). As one court has explained, "interviews lasting several hours (as opposed to entire days)" generally are "not indicative of coercion." *United States v. Stokes*, 631 F.3d 802, 809 (6th Cir. 2011).

Moreover, officers questioned Adkisson in a calm and conversational manner; they never yelled, pounded on the table, or otherwise acted aggressively. *See State v. McKinney*, 669 S.W.3d 753, 772 (Tenn. 2023) (confession of juvenile voluntary where "the detectives were polite, calm, and respectful in tone"); *Dassey v. Dittman*, 877 F.3d 297, 313 (7th Cir. 2017) (explaining that, "[g]iven the history of coercive interrogation techniques from which modern constitutional standards for confessions emerged," it was "important" that "investigators stayed calm and never even raised their voices").

The majority finds it significant that Adkisson "steadily denied any involvement in the shooting for roughly six hours" after he was initially detained. But the officers here did not engage in any tactics that could render the *length* of the detention alone coercive. They did not deprive him of food, water, or sleep. They did not question him in an aggressive or hostile manner. And they did not subject him to nonstop questioning or physical abuse. What's more, Adkisson's confession followed a lengthy break. *See United States v. Jacobs*,

---

[5] The majority stresses that Adkisson was "unable to sleep" because he could not "get comfortable," but there is no evidence that officers forcibly deprived Adkisson of sleep.

63 F.4th 1055, 1061 (6th Cir. 2023) (rejecting the notion that "a break in an interview can contribute to coercion" and explaining that "the opposite is true" because "incessant questioning *without* any breaks can support a finding of coercion" (citing *Spano*, 360 U.S. at 322)). Nothing about this timeline suggests that Adkisson confessed because officers wore him down and overcame his will. To the contrary, the length of the interrogation is more a function of Adkisson's evolving story than the "officers' application of the 'third degree' or anything approaching it." *United States v. Williams*, 612 F.3d 417, 422 (6th Cir. 2010).

Of course, the majority's holding that Adkisson's confession was involuntary is not based on the duration of his detention alone. The majority also finds that certain statements that officers made to Adkisson contributed to his confession, as did their unwillingness to give him access to his mother. Although I agree with the majority that some of the officers' tactics were ill-advised, I do not believe they rise to the level of unconstitutional coercion.

Investigator Williams's statement to Adkisson, a juvenile, that he was "looking at possibly the death penalty" was incorrect and egregious. But the question for this Court is whether that statement—in combination with the other circumstances of the interrogation—so overbore Adkisson's will that he was coerced into confessing. For a couple of reasons, the record does not support that conclusion.

*First*, viewed in context, Investigator Williams's initial brief reference to the death penalty did not play a significant role in the officers' interrogation of Adkisson. Investigator Williams mentioned the possibility of the death penalty within the first twenty minutes of the interrogation, and neither he nor any other officer brought it up again. The only time the death penalty was revisited was about forty minutes later, when Adkisson told Chief Sellers that Investigator Williams had said he could be facing the death penalty. Chief Sellers responded, "I don't know about that. We don't know about that." I agree with the majority that Chief Sellers's equivocal response to Adkisson's question about the death penalty fell short of a correction. But Chief Sellers neither endorsed nor reinforced Investigator Williams's earlier misstatement. And although Investigator Williams initially mentioned the death penalty to underscore the seriousness of the situation and to encourage Adkisson to cooperate and tell the truth, neither he nor any other officers made a specific promise of leniency related to the death penalty or directly threatened Adkisson with the death penalty if he refused to talk.

For that reason, this case is distinguishable from others in which references to the death penalty rendered the confession involuntary. *See Ford*, 201 S.W.2d at 542 (noting that trial court properly excluded a confession made after an officer told the defendant that the prosecution would "not ask for the electric chair" if he confessed (internal quotation marks omitted)); *Dye v. Commonwealth*, 411 S.W.3d 227, 232–33 (Ky. 2013) (confession involuntary where officers "incorrectly and repeatedly informed [the juvenile defendant] that, if convicted, he could receive the death penalty" and told the defendant after each reference to the death penalty that "the only way . . . to avoid execution was to confess to

the murder"); *Green v. State*, 605 A.2d 1001, 1003–04 (Md. Ct. Spec. App. 1992) (confession involuntary where officer told the juvenile defendant that he could "get . . . the electric chair" if he did not "tell [the officer] what happened").

*Second*, the timing of Adkisson's confession suggests that the reference to the death penalty was not a factor in his decision to confess. Investigator Williams's reference to the death penalty and Adkisson's follow-up question to Chief Sellers both occurred within the first hour of Adkisson's detention. Adkisson confessed more than five hours later. No one mentioned the death penalty during those five hours, and there is no indication in the record that the earlier reference was continuing to weigh on Adkisson or influence his decision making. The considerable passage of time between the references to the death penalty and Adkisson's confession thus weighs in favor of voluntariness. *See State v. Garner*, 614 N.W.2d 319, 327–28 (Neb. 2000) (confession of juvenile defendant voluntary where officers' brief references to the death penalty did not include "an explicit threat or promise of leniency" and "a considerable amount of time passed" between the references and the confession).

The majority also focuses on other statements officers made to Adkisson. Chief Sellers told Adkisson that he was "just as guilty" as his co-defendant because Adkisson was with him at the time of the shooting and suggested that the jury would not believe that he did not know his co-defendant was going to shoot. He also asked Adkisson if he knew "what they do to seventeen-year-olds" in the state prison. When Adkisson shook his head no, Chief Sellers said, "I don't think you want to know." Moreover, Investigator Williams falsely told Adkisson that he had a video of the shooting that incriminated him.

But statements of this sort are common interrogation techniques that do not appreciably move the needle toward involuntariness. *See, e.g.*, *Smith*, 933 S.W.2d at 456 (noting that "[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary" (alterations in original) (quoting *United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987))); *Dassey*, 877 F.3d at 313 (explaining that "deception is a common interview technique" and "has not led courts . . . to find that a subject's incriminating answers were involuntary" (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969))); *United States v. Jacques*, 744 F.3d 804, 811 (1st Cir. 2014) ("[T]he mere fact that a defendant is placed 'under some psychological pressure' by agents does not necessarily render a confession involuntary." (quoting *United States v. Jobin*, 535 F.2d 154, 159 (1st Cir. 1976))). Indeed, the "interrogation of a suspect will always involve some pressure 'because its purpose is to elicit a confession.'" *United States v. Dehghani*, 550 F.3d 716, 720 (8th Cir. 2008) (quoting *United States v. Martin*, 369 F.3d 1046, 1055 (8th Cir. 2004)).

The absence of Adkisson's mother from the interrogation room does not render the confession involuntary either. To be sure, the officers' refusal to allow Adkisson to see his mother, even though she was present at the station and Adkisson repeatedly asked for her, is troubling. But here again, the question for purposes of voluntariness is whether the

absence of Adkisson's mother—in combination with all other relevant circumstances—allowed officers to overbear his will. *See State v. Carroll*, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999) ("[T]he admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation."); *see also State v. Bybee*, 1 P.3d 1087, 1094 (Utah 2000) (explaining that "the presence of a parent or an attorney is a factor that should be considered by the court" but "is not determinative" (quoting *State v. Dutchie*, 969 P.2d 422, 429 (Utah 1998))).

On this record, I do not believe the officers' exclusion of Adkisson's mother from the interrogation room led to a coerced confession. Adkisson was a senior in high school and only eight months away from his eighteenth birthday. He was twice fully advised of his constitutional rights and had no difficulty understanding the officers or appreciating the gravity of his situation. *See Bybee*, 1 P.3d at 1094 (confession of seventeen-year-old possessing "average intelligence" voluntary even though officers refused his request to see his father). Cases relying on the absence of a parent or other interested adult to find a confession coercive have involved much younger juveniles with a more limited capacity to understand their circumstances. For example, *Haley v. Ohio*, 332 U.S. at 597, involved a fifteen-year-old, and *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962), involved a fourteen-year-old who could not "be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions."

Moreover, although Adkisson became emotional at times when left alone in the interrogation room, he remained calm and in control when speaking with the officers. At no time during the interrogation did he appear to be in distress or unable to exercise his own judgment. *See Kelly*, 603 S.W.2d at 729 (confession of eighteen-year-old defendant voluntary where there was "no indication that he was other than calm and in full control of his emotions and reasoning powers"). Adkisson confessed to participating in the shooting only after a lengthy break in the interrogation. And when Adkisson finally told Detective Whitney the whole story, it was *Adkisson* who initiated the conversation by knocking on the door, asking the detective to return, and expressing his desire to "start all the way over."

Viewing all the circumstances together, the most reasonable inference from the record is that Adkisson confessed because he decided to tell the truth, not because his will was overborn. Neither the federal constitution nor the Tennessee Constitution prohibits a defendant from confessing because of a guilty conscience. Quite the opposite: a confession made when a defendant's "guilt bears heavily upon his conscience" is not coerced but rather "free and voluntary." *Alfred v. State*, 32 Tenn. 581, 589 (1853); *see also McKee*, 525 F.3d at 434 (confession voluntary where "it was [the defendant's] conscience, not the police, that overbore his prior efforts to disclaim any responsibility for the robbery and murder").

Especially in a case like this, we must take care not to conflate what we view as best police practices with constitutional requirements. Investigator Williams's statement that Adkisson could possibly be facing the death penalty and the officers' refusal to allow

Adkisson to see his mother are regrettable. But that does not make the interrogation in this case unconstitutional. *See, e.g.*, *United States v. Taylor*, No. 09-43-ART, 2010 WL 2923191, at *3 (E.D. Ky. July 23, 2010) ("Best practices and constitutional mandates do not always coincide."). Here, despite the officers' missteps, the record shows that Adkisson's confession was "free and voluntary," not the product of police coercion. *Alfred*, 32 Tenn. at 589. I would therefore affirm Adkisson's convictions and the judgment of the Court of Criminal Appeals. I respectfully dissent from the majority opinion to the extent it holds otherwise.

_____

SARAH K. CAMPBELL, JUSTICE